IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| Gloria Medina, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 C 2189 |
| | ) | Judge Ronald A. Guzmán |
| Berwyn South School District 100, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion for summary judgment [42] is granted and Plaintiff's cross-motion for summary judgment [54] is denied. All pending motions are denied as moot. Civil case terminated.

## STATEMENT

After she was terminated from her position as an administrative assistant with Berwyn School District 100 ("District"), Gloria Medina sued the District for discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq*. ("ADA") and interference with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"). Both the District and Medina move for summary judgment on both claims. For the reasons set forth below, the District's motion is granted and Medina's motion is denied.

**Facts**

Medina was hired by the District on or about January 5, 1998 to serve as the secretary and receptionist for the Building and Grounds Department. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 56, ¶ 1.) In 2000, Medina became the secretary to the Director of Title VII Grants, and in July 2001, she assumed the additional role of Administrative Assistant to the Director of the Bilingual Grant Program. (*Id*. ¶¶ 2, 3.) The Director of Title VII Grants and the Director of the Bilingual Grant Program were the same individual. (*Id*. ¶ 3.) Medina's duties as Administrative Assistant to the Bilingual Department included, among other things, providing clerical support to the director, interpreting and translating documents as needed, monitoring and meeting scheduled program reports, and maintaining an accurate record-keeping system. (*Id*. ¶ 4.) Medina's job required organizational, communication, and computer skills, effective interpersonal skills, and proficiency in both written and oral Spanish and English. (*Id*. ¶ 5.) Medina reported to the Director of the Bilingual Grant Program/Bilingual Department and the Superintendent. (*Id*. ¶ 6.) Medina was approved for and took an FMLA leave between July 30, 2014 and August 18, 2014, which was subsequently extended to October 1, 2014. (*Id*. ¶ 7.) Medina was approved for a second FMLA leave from July 6, 2015 to October 6, 2015, but returned to work on August 31,

2015.  (*Id.* ¶¶ 11, 12.)

Beatriz Maldonado, who was Principal of the District's Emerson Elementary School, also became Director of the Bilingual Department in July 2015.  (*Id.* ¶ 8.)  Around the time that Medina was returning to work after her second FMLA leave, the District was combining the offices of Heritage School and Emerson Elementary School into one main office in the Heritage School building.  (*Id.* ¶ 13.)  Medina moved with Maldonado to the new combined office in the Heritage Building, and her job title remained the same.  (*Id.* ¶ 14.)  A new database for tracking student information, PowerSchool, was being introduced prior to the start of Medina's FMLA leave in July 2015.  (*Id.* ¶ 15.)  In a July 1, 2015 email to Medina, Maldonado informed Medina that she had arranged for Medina to be trained on the PowerSchool system, explaining that "data accuracy is one of the biggest responsibilities in the department, thus the importance of this task is high."  (*Id.* ¶ 16.)  In her July 2, 2015 response, Medina agreed with Maldonado that "data accuracy is a major responsibility," but she did not receive the training prior to her taking the scheduled FMLA leave.  (*Id.* ¶¶ 15, 18.)  The PowerSchool program was "very different" from the previous program used by the District, and knowledge of the PowerSchool program was required for Medina's position.  (*Id.* ¶ 19.)

In a meeting on the morning of August 31, 2015, Medina's first day back, Maldonado told Medina that her priorities were learning and familiarizing herself with the PowerSchool program and translating.  (*Id.* ¶¶ 20, 21.)  While the parties dispute whether Medina had a private office prior to the combination of the Emerson and Heritage Schools, and the record is unclear in this regard, it is undisputed that upon her return to work on August 31, 2015, Medina was placed in a newly-combined office with two other secretaries, which served both Emerson and Heritage Schools.  (Def.'s Resp. Pl's Stmt. Facts, Dkt. # 59, ¶ 16.)

On August 31, 2015, at 2:42 p.m., Jean Suchy, Assistant Principal of Emerson School, sent Medina an email asking her to complete a translation of a Welcome Back to School letter by noon on September 1, 2015.  (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 56, ¶ 23.)  At approximately 3:00 p.m. on September 1, 2015, Medina had a meeting with Maldonado in her office, at which Suchy was also present.  (*Id.* ¶ 24.)  Medina explained that "she couldn't do the translations" because she had trouble concentrating due to the noise and confusion in the office.  (*Id.* ¶ 25.)  Medina further stated that the translation would take more time because she had to answer phones, take care of parents, and help a colleague.  (*Id.*)  According to Medina, Maldonado became upset when Medina told her she needed more time, and Maldonado, after telling Medina that "she needed to multitask, or else," "lunged" toward Medina.  (*Id.* ¶ 26.)  When Medina responded "Or else, what?", Maldonado told Medina she was being insubordinate.  (*Id.*)  On September 2, 2015, Maldonado had a conversation with Medina at her desk regarding the translations, and Medina recorded the conversation with her cell phone.  (*Id.* ¶¶ 28, 29.)  Later that day, at approximately 3:00 p.m., Medina and Maldonado met in Maldonado's office, again with Suchy present, and Maldonado pointed out errors in Medina's translation of the Welcome Back letter.  (*Id.* ¶¶ 30, 31.)  During the meeting, Maldonado asked Medina why she was holding her cell phone, and Medina responded by twice asking, "Why can't I hold my phone?"  (*Id.* ¶ 33.)

Maldonado told Medina she was being insubordinate and ended the meeting. (*Id*. ¶¶ 33, 34.) Medina, who described her anxiety level at that time as being "high," accused Maldonado of treating her like an animal and kicking her out of the office. (*Id*. ¶ 34.) Using her cell phone, Medina called her therapist, who instructed her to call an ambulance. (*Id*. ¶ 35.) Medina then went to the main office, which she described as "noisy" and "crowded" with parents and students. (*Id*. ¶ 36.) Using her desk phone in the main office, Medina called 911 and hung up, called 911 a second time and again hung up, and on the third call, told the dispatch operator that she was having a panic attack. (*Id*. ¶ 37.) After the hang ups, a 911 operator called the school back, and the Assistant Principal of Heritage School, Allison Boutet, who was in the main office at the time, told the operator that the person who had called and hung up was, at that moment, on the phone with a 911 operator. (*Id*. ¶ 38.) Boutet told Medina the address of the school to provide to the 911 operator, and then escorted Medina to the nurse's office, which is located right next to the main office. (*Id*. ¶¶ 38, 39.) A police officer and paramedics arrived and took Medina out on a gurney while Maldonado and Suchy were standing in the hallway. (*Id*. ¶ 41.) As she was being taken out, with students and parents present, Medina testified that she yelled, "[Y]ou caused it. You did this to me. You both—you—did this to me, Beatrice. You did this to me," and Maldonado smirked. (Medina Dep., Def.'s Ex. K, Dkt. # 41-12, at 74.)

Suchy believed that Medina's behavior toward Maldonado in the meetings on September 1 and 2, 2015, which included raising her voice and using an inappropriate tone, was disrespectful and unprofessional. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 56, ¶ 43.) While the District disputes the evidentiary support for certain of Medina's statements of fact, it appears uncontested that Medina was diagnosed with major depression and generalized anxiety disorder at least as of August 2014, and that there was no physical harm or property damage related to Medina's purported panic attack on September 2, 2015. (Def.'s Resp. Pl.'s Stmt. Facts, Dkt. # 59, ¶¶ 3, 8, 11.)

The District sent a letter dated September 3, 2015 to Medina stating that she was being placed on administrative leave, effective immediately, due to her unprofessional and insubordinate conduct towards her supervisor and her 911 hang-up calls. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 56, ¶ 44.) The letter indicated that an investigation was necessary, and she would be arrested if she set foot on District property. (*Id*.) In a letter to the District dated September 4, 2015, Medina's psychiatrist, Dr. Lee Weiss, and her therapist, David Hodgson, related that it was in Medina's best interests to be placed on medical leave under the FMLA due to her medical condition and her inability to function at work. (*Id*. ¶ 45.)[1]

In a letter dated September 10, 2015, the District informed Medina that after an investigation, Superintendent Stanley Fields was recommending to the Board of Education of Berwyn South School District 100 ("Board") that Medina be terminated because she engaged in

---

[1] Because the parties construe this September 4, 2015 letter as a request for FMLA leave, the Court does as well.

misconduct. (*Id.* ¶ 49.) Specifically, the letter stated, in part, as follows:

> Your conduct on September 2, 2015, constitutes insubordination and misconduct. Specifically, yelling at Principal Maldonado and Assistant Principal Suchy; speaking on your cell phone in an unprofessional manner in the presence of students, parents, and other staff in the Emerson main office; calling and hanging up in 911 emergency dispatchers from a District school phone line; and failing to follow proper District procedures for requesting and taking a personal day, is conduct that disrupts the educational environment and violates Board Policies 5:120, 5:125 and 5:330. Accordingly, I will be recommending your termination from employment with the District to the [Board] at its Wednesday, September 23, 2015, regularly scheduled Board meeting.

(Def.'s Ex. DD, Dkt. # 41-31, at 2.) The letter advised Medina that she had the right to address the Board and present evidence. (*Id.*) Although the District moves to strike the relevant statements of fact, Medina purportedly related to her therapist, Hodgson, that she felt harassed by the administration and believed that Fields was looking to get rid of her. (Def.'s Resp. Pl's Stmt. Facts, Dkt. # 59, ¶¶ 29, 30.)[2]

Medina provided a Certification of Health Provider dated September 18, 2015 and signed by Weiss and Hodgson, indicating that Medina was unable to do her job due to her mental health condition. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 56, ¶ 46.) The District acknowledged receipt of the certification in a letter to Medina dated September 22, 2015, which stated: "Please be advised that because you are currently on paid administrative leave, pending the Board of Education's vote on Dr. Fields' September 10 2015, recommendation to terminate your employment, the District will consider your FMLA request after the Board of Education's September 23, 2015 meeting." (*Id.* ¶ 51.) On September 23, 2015, the Board dismissed Medina from her administrative assistant position. (*Id.* ¶ 52.)

**Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw,*

---

[2] The Court need not rule on the motion to strike these statements of facts as they are not material to resolution of the motions for summary judgment.

4

*LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

**Analysis**

<u>ADA Discrimination</u> (Count I)

Medina alleges that she was terminated in violation of the ADA "as the result of conduct that was a manifestation of her disability, that is, severe work-related stress." (Compl., Dkt. # 1, ¶ 56.) "The ADA . . . prohibit[s] an employer from discriminating against a qualified individual with a disability." *Guzman v. Brown Cty.*, No. 16-3599, 2018 WL 1177592, at *6 (7th Cir. Mar. 7, 2018) (citing 42 U.S.C. § 12112; 29 U.S.C. § 794). "In order to defeat summary judgment on her disability discrimination claim, [Medina] must point to evidence capable of establishing that (1) she is a person with a disability within the meaning of the ADA . . . ; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered from an adverse employment decision as a result of her disability." *Id*. Under current Seventh Circuit precedent, if the parties do not argue for a different type of causation, the "but for" standard is appropriate. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (noting that the ADA Amendments Act changed the language from prohibiting employers from discriminating 'because of' a disability to 'on the basis of' a disability, but stating that because "the parties . . . have not argued that another causation standard should apply, . . . we will continue to apply the 'but for' causation standard") (citations omitted). "To show that disability discrimination was the 'but for' reason for the termination, a plaintiff can use either direct or circumstantial evidence." *Id*. While direct evidence is essentially an admission that the defendant fired the plaintiff due to her disability, circumstantial evidence can include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014).

Pointing to the events of the day at issue, the District contends that regardless of whether Medina was disabled, "when an employee engages in behavior that is unacceptable in the workplace . . . , the fact that the behavior is precipitated by her mental illness 'does not present an issue under the Americans with Disabilities Act'; the behavior itself disqualifies her from continued employment and justifies her discharge." *Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 571 (7th Cir. 2016) (citation omitted). Medina does not dispute that she engaged in the conduct for which she was terminated. She seeks instead to downplay its seriousness, calling it a "single day's strained conduct," (Pl.'s Resp., Dkt. # 54, at 7), and asserting that she was actually terminated because she had become a "challenge and an irritation to [Superintendent] Fields'

5

authority." (*Id*. at 9.)  In addition, she maintains that the violations cited by Fields as the basis for his recommendation that she be terminated are "ludicrous" and unreasonable. (*Id*. at 11.)

But these arguments miss the point; Medina was terminated for her unprofessional conduct, not because of her disability.  At her deposition, Medina testified that her conversation with Maldonado on the afternoon of September 2, 2015 became somewhat tense after Medina admitted to recording their conversation earlier in the day.  (Def.'s Ex. K, Medina Dep., Dkt. # 41-12, at 55-57.)  When Maldonado asked Medina why she again was holding her phone at the afternoon meeting, Medina responded twice with "Why can't I hold my phone?" (*Id*. at 56-57.)[3] After Maldonado told Medina she was being insubordinate and directed her to leave the office, Medina testified that she began to have a panic attack and accused Maldonado of treating her like an animal. (*Id*. at 59.)  According to Medina, she was "probably" yelling. (*Id*. at 60.)  As she was walking down the internal hallway back to the main office, Medina used her cell phone to call both her therapist, who directed her to call 911, and her father. (*Id*. at 65.)  Upon reaching the main office, Medina stated out loud to no one in particular that she was not feeling well, and "struggl[ed] to cross the students . . . and parents" in order to "make [her] way" to her desk to call 911. (*Id*. at 66-67.)  After Medina called 911 and twice hung up before speaking with a dispatcher on the third call, paramedics and a police officer arrived at the school. (*Id*.) According to Medina, as she was taken out of the school on a gurney by paramedics in front of other staff, parents, and children, she was "going crazy" and "yelling" that "Principal Maldonado did this to me." (*Id*. at 73-74.)

Superintendent Fields determined that Medina's behavior violated at least District Policy 5:120, which provides, in part, that "[a]ll District employees are expected to maintain high standards in their school relationships, . . . to be considerate and cooperative, and to maintain professional and appropriate relationships with students, parents, staff members, and others." (Def.'s Ex. PP, District Policy 5:120 Ethics & Conduct, Dkt. # 41-43.)  At a time of significantly-heightened concerns regarding school security and the physical safety of students and staff, the Court cannot conclude that the District's decision to terminate Medina based on her unprofessional and disruptive behavior violates the ADA.  *See Palmer v. Cir. Ct. of Cook Cty*., 117 F.3d 351, 352 (7th Cir. 1997) ("The [ADA] does not require an employer to retain a potentially violent employee.  Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone.").

Medina's cross-motion for summary judgment on the ADA claim is denied for the same reason.  In addition, to the extent that Medina seeks to rely on the indirect method of proof to show discrimination, she has failed to establish a prima facie case as she does not demonstrate that she was meeting the District's legitimate expectations or identify any similarly-situated non-disabled comparators who were treated more favorably.  *See Aberman v. Bd. of Educ. of City of*

---

[3] Medina testified that "[i]t's vague, but I may have recorded [Maldonado]" at the afternoon meeting. (Def.'s Ex. K, Medina Dep., Dkt. # 41-12, at 57.)

6

*Chi*., 242 F. Supp. 3d 672, 689 (N.D. Ill. 2017) ("[S]ince Plaintiff has not shown that she was meeting her employer's legitimate expectations and has not shown that a . . . nondisabled similarly situated comparator received more favorable treatment, Plaintiff has not established a prima facie case of discrimination under the ADA. . . ."). Even assuming she established a prima facie case of discrimination, Medina engages only in speculation and points to no record evidence demonstrating that the District's basis for terminating her was a lie. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) ("Because [the defendant] has proffered legitimate, nondiscriminatory reasons for firing [the plaintiff], he must produce evidence that those reasons were actually pretext for discrimination", or in other words, a "lie.").

Accordingly, the District's motion for summary judgment as to the ADA claim is granted while Plaintiff's cross-motion is denied.

FMLA Interference (Count II)

Under the FMLA, an eligible employee is entitled to twelve workweeks of leave because of, among other reasons, "a serious health condition that makes the employee unable to perform the functions of [her] position . . . ." 29 U.S.C. § 2612(a)(1)(D). "The FMLA . . . makes it unlawful for an employer to interfere with an employee's attempt to exercise FMLA rights or to retaliate against employees who exercise their FMLA rights." *Guzman,* 2018 WL 1177592, at *3 (citing 29 U.S.C. § 2615).[4] An employee who takes FMLA leave is entitled upon returning from the leave to be restored to the same or equivalent position she held at the time the leave commenced. 29 U.S.C. §§ 2614(1)(A), (B). "In order to prevail on a FMLA interference claim, an employee must establish that (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Id*.

Medina contends that when she returned from FMLA leave on August 31, 2015, she returned to a non-equivalent position. Medina's brief argument as to this issue, without supporting citations to the record, is as follows:

> Plaintiff returned from FMLA leave, without training, to an unfamiliar computer database, was stationed in the schools' secretarial pool, and was denied a private office commensurate with her position. Plaintiff was presented with a new job description replete with clerical tasks regarding which she was without training or experience. Plaintiff, receiving little guidance from her superiors, was told to

---

[4] Medina alleges only an FMLA interference claim and did not respond to the District's argument that she failed to allege a retaliation claim; therefore, Medina has waived any FMLA retaliation claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

7

> seek instruction from one of the clerks. At one point she found herself, to the mutual dismay of herself and the school Librarian, at the school library pursuing a project designed to keep track of the school's I-pads! Plaintiff was left to wonder what the future would hold for her in terms of job prospects as she gazed across . . . the hallway to the private office occupied by Maria Anderson, whom she was told had taken over the translation duties in Plaintiff's absence.

(Pl.'s Resp., Dkt. # 54, at 13.)[5] Notably, while making general statements about a "new" job description, Medina fails to point to any record evidence specifically identifying how her duties purportedly changed upon her return from FMLA leave. Nor does Medina place her perceived demotion in context of the relevant circumstances, including the following:

- Her former school was consolidating space and operations with another one, thus necessitating the move to a new working space
- The transition to the PowerSchool computer system was occurring before and during her FMLA leave, and for reasons she fails to identify, Medina did not obtain training on the new system prior to her leave, despite Maldonado having scheduled training for her
- While complaining that she was required to perform clerical duties on her return, Medina's job description as Administrative Assistant to the Director of the Bilingual Department included clerical duties to support the Director
- Medina returned to her job on August 31, 2015 with, she admits, the same title and salary, and still repored to the Director of Bilingual Studies.

In light of these deficiencies, the Court finds that Medina has failed to establish that she was not restored to the same or equivalent position upon returning from FMLA leave on August

---

[5] Medina often fails to include citations to statements of fact in her response brief, and further does not discuss many of her statements of fact in her response. It is not this Court's role to sift through the statements of fact to determine which might be relevant to a party's argument, particularly when the party is represented by counsel. As noted by another court in this district:

> It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties. Instead, it is the advocate's job to make it easy for the court to rule in his client's favor. Judges are not like pigs, hunting for truffles buried in briefs. Nor are they archaeologists searching for treasure.

*In re Ace Track Co., Ltd.*, 556 B.R. 887, 903 (Bankr. N.D. Ill. 2016) (internal citations, quotation marks, and ellipses omitted).

8

31, 2015.

Medina also contends that her September 4, 2015 application for FMLA leave was wrongly denied. Medina's only argument in this regard is that because she was terminated in violation of the ADA, her request for FMLA leave was also improperly denied. The Court, however, has concluded that she was not terminated in violation of the ADA, so this argument fails. Accordingly, the District's motion for summary judgment as to Medina's FMLA interference claim is granted, and Plaintiff's cross-motion is denied.

**Conclusion**

For the reasons stated above, Defendant's motion for summary judgment is granted and Plaintiff's cross-motion is denied.

**Date**: April 10, 2018      _____
                                      **Ronald A. Guzmán**
                                      **United States District Judge**